J-A04021-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| N.M. AND M.M | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| v. | : | |
| | : | |
| J.N.M., J.W., AND R.M. | : | |
| | : | |
| | : | |
| APPEAL OF: J.W., FATHER | : | No. 1823 EDA 2020 |

Appeal from the Order Entered August 28, 2020
In the Court of Common Pleas of Carbon County
Civil Division at No(s): No. 14-1196

BEFORE:   STABILE, J., KING, J., and PELLEGRINI, J.*

MEMORANDUM BY KING, J.:                    **FILED: FEBRUARY 19, 2021**

Appellant, J.W. ("Father"), appeals from the order entered in the Carbon County Court of Common Pleas, which denied his Petition to Modify Existing Custody Order, as it relates to his minor child ("Child") (born December 2008). We affirm.

In its opinion, the trial court accurately set forth the relevant facts and procedural history of this case as follows:

> This case dates back to June 20, 2014, when the [p]laintiffs, [N.M. and M.M. (collectively, "Grandparents")], who at all relevant times resided [in]…Summit Hill, Carbon County, Pennsylvania, filed a custody complaint requesting that the [c]ourt award them sole legal and physical custody of their grandchild J.M, and his half-brother, [Child]. The [d]efendant in this case is [("Mother")], who is the mother of J.M. and…Child. Though [Grandparents] have no

_____

* Retired Senior Judge assigned to the Superior Court.

biological relation to…Child, both children have resided with them for a majority of their lives.[1]  The Grandparents further disclosed that…Child's father was not known to them and that he had not been in…Child's life to that point.

After proceedings had begun, but before the [c]ourt had issued a final custody order concerning…Child and J.M., [Father] filed a Petition to Intervene.  Father asserted his belief that he was the biological father of…Child and sought primary physical custody of…Child through his intervention in this matter.  At all times relevant, Father has resided [in] Columbus, Ohio, with his wife, [L.T.], and step-child, [D.]

Father averred through his Petition to Intervene that Mother had concealed herself and [C]hild from Father since…Child's birth and that he had been unable to locate Mother or…Child until discovering a docket listing for this case.  Father therefore asserted that his petition should be granted so that he could "finally enjoy his right as a parent to have a relationship with his son, and be part of the child's life[.]"

In the Grandparents' pre-trial memorandum of September 29, 2014, they argued that they should be awarded primary physical custody of…Child and J.M. because the children had resided with Grandparents since September 2010.  Mother resided with Grandparents and the children from September 2010 to September 2013.  However, Grandparents asserted that they have been the primary caretakers of the children since September 2010. …

On October 2, 2014, Father's Petition to Intervene was granted.  Father was confirmed to be the biological father of…Child on December 3, 2014.

Through his pre-trial memorandum, Father argued that Mother had concealed…Child from him until 2014.  However, since locating…Child, Father had maintained constant phone contact with him and had one visit with…Child in Ohio.  Father argued that the above actions had demonstrated "a strong desire and dedication to be part of his son's life[.]"

---

[1] Grandparents are the biological paternal grandparents of Child's half-brother.

- 2 -

A custody hearing was held on March 13, 2015 before this [c]ourt. On March 25, 2015, [the court] entered an order awarding joint legal custody of…Child to Grandparents and Father. However, Grandparents were awarded primary physical custody, while Father was awarded partial physical custody. Father's periods of custody were set for the summer recess [of the school year] and the Christmas holiday in odd numbered years with the precise exchange times to be mutually agreed upon by Grandparents and Father. The [c]ourt further ordered that telephone contact be permitted between…Child and the non-custodial party.

On January 29, 2018, Father filed a petition to modify the custody order of March 25, 2015, in which he again requested that the [c]ourt award him primary physical custody of…Child. Through his petition, Father asserted that he is "better-suited at this time to care for the emotional, mental, physical and educational needs of the minor child[.]"

In their pre-trial memorandum relative to Father's petition to modify the custody order, Grandparents argued that primary physical custody of…Child should remain with them, as "a transfer of custody would be particularly inappropriate in light of the fact that, were Father to obtain custody, the same would, necessarily, necessitate a relocation of the minor child from the Commonwealth of Pennsylvania to the State of Ohio[,] thus taking him away not only from the home, extended family, friends, school, community, etc. which he has known for the past ten (10) years, but, also, from his sibling of whom the Grandparents continue to maintain primary physical custody[.]"

Father filed a pre-trial memorandum on November 27, 2018, in which he asserted that Grandparents [had] failed to encourage frequent and continuing contact between…Child and Father. In support of that position, Father alleged that he was often denied telephone contact with…Child, and that Grandparents [had] cancelled or failed to appear for reunification therapy sessions (Father and…Child began participating in the sessions after the initial custody order was entered) on several occasions[.]

At the hearing on Father's modification petition, …Child was interviewed *in camera*. [C]hild expressed a desire to remain with Grandparents, as he misses his half-brother while he is in Ohio. Grandfather testified that…Child and J.M. "spend almost every waking moment together."

[The court] denied Father's petition to modify the custody order on January 11, 2019. "Based upon their role as primary custodians and caregivers for the last eight and one half (8½) years, [the court found] that Grandparents are more likely to attend to the daily physical, emotional, developmental and educational needs of…Child. While [the court] believe[s] that Father is sincere in his desire to be more actively involved in…Child's life, the fact remains that he has not fully exercised the partial physical custody rights vested in him by this [c]ourt in our Order of March 25, 2015, spending one (1) month with…Child in Ohio during the summer of 2015 and two (2) months during the summer of 2018 rather than two and a half (2½) months each summer and one (1) week between Christmas Eve and New Years Eve in alternating years previously awarded by the [c]ourt[.]"

On March 6, 2019, Father filed a petition for contempt alleging that Grandparents had failed to produce…Child for reunification therapy sessions as well as scheduled phone calls. Further, Father alleged that Grandparents had failed to allow…Child the privacy to speak openly with Father during therapy and phone calls, and threatened to send…Child to therapy wearing a concealed recording device[.]

Pursuant to this [c]ourt's order of April 24, 2019, Father's petition for contempt was denied following an evidentiary hearing. However, by agreement of the parties, Father was granted telephone contact with…Child every Monday, Wednesday, and Friday, between 7:00 p.m. and 7:15 p.m.

On July 30, 2019, Father filed a petition for special relief alleging that…Child had confided in him instances of sexual abuse by members of Grandparents' household, one of whom continued to reside at Grandparents' house. The two individuals alleged to have been involved were [E.A.] and a minor child (J.P.) who had only resided with Grandparents

for two months, and [were] not currently residing with Grandparents. Father requested through his petition that he be awarded primary physical custody and that Grandparents' periods of custody be suspended pending the outcome of the investigations[.]

The allegations raised by…Child were investigated by the Carbon County Office of Children and Youth Services and the Lehigh Valley Children's Advocacy Center. [C]hild's report was validated and the allegations were referred to the Summit Hill Police Department. Additionally, Father's period of custody was extended pending the results of the investigation.

On September 9, 2019, Father filed a petition to modify the custody order…in light of the sexual abuse investigation concerning…Child[.] However, …Child later recanted the allegations on October 9, 2019[.] After an interview of…Child by Emily Greenwald of Carbon County Children and Youth Services, …Child was deemed safe in Grandparents' home[.]

After a hearing on Father's petition for special relief, the [c]ourt issued an order on September 13, 2019 allowing Grandparents to resume primary physical custody on September 14, 2019 provided that Grandparents "immediately evict and exclude [E.A.] (one of the perpetrators alleged by…Child) from their residence[.] [Grandparents] shall ensure that [E.A.] has no contact with [Child.]" Other than the aforementioned conditions, the March 25, 2015 order was to remain in effect[.]

Thereafter, Grandparents filed a petition to modify the custody order on December 18, 2019. Through their petition, they claimed that…Child has recanted his allegations against [E.A.], and that the restrictions concerning [E.A.] should be removed[.]

On January 17, 2020, Father filed a petition for contempt alleging that Grandparents had failed to produce…Child for Father's one-week period of custody during the Christmas holiday, as directed by the March 25, 2015 order. Additionally, Father alleged that Grandparents (and the rest of their household) continue[d] to interfere with Father's

- 5 -

scheduled telephone calls with…Child[.]

Grandparents explained that they had attempted to comply with the order to produce…Child for the visit with Father over the Christmas holiday. However, …Child refused to go, and had threatened to jump out of the car if Grandparents forced him to go. Therefore, Grandparents made the decision that…Child should not attend the visit with Father[.]

On February 5, 2020, Father filed a pre-trial memorandum in support of his petition to modify the custody order. …

Hearings began on February 12, 2020 relative to the outstanding petitions. Susan [Barradale[2]], who is the reunification counselor for…Child and Father, testified that she became involved in this case on March 24, 2018. [C]hild had been having difficulty connecting with Father, and Father wanted…Child's next visit to be more comfortable. Ms. [Barradale] testified that one of the issues disclosed to her by…Child is that he "doesn't like places with a lot of people." [C]hild has also maintained that he misses his brother while he is away, even after he became more comfortable in Father's household.

On June 9, 2020, Grandparents filed a petition to modify custody and for an expedited hearing asking that the [c]ourt suspend Father's period of custody during the summer recess until after the completion of the hearing on all outstanding petitions. In support of their position, they alleged that…Child was unwilling to attend the summer 2020 visit with Father and was threatening to run away or take other extreme measures if forced to attend[.]

Father filed an answer to Grandparents' special relief petition on June 22, 2020. Father asserted that he was opposed to the suspension of his period of custody over the summer, and asked the [c]ourt to order that…Child be evaluated by a mental health provider if he was threatening any form of self-harm[.]

_____

[2] Ms. Barradale's name is spelled several different ways in the trial court opinion. We use the spelling of "Barradale" as set forth in the notes of testimony. (N.T. Hearing, 2/12/20, at 2, 4).

On that same day, Father filed an emergency petition for special relief asking that the [c]ourt hold Grandparents in contempt. Father alleged through his petition that Grandparents failed to produce…Child for Father's period of custody beginning on June 12, 2020, [and] that Grandparents [continued to act in contempt of the court's prior custody order].

A hearing was held before this [c]ourt on Grandparents' petition to modify custody and for an expedited hearing and Father's emergency petition for special relief on July 17, 2020. [C]hild was interviewed *in camera* during the hearing, where he expressed that he had no desire to see Father at all. According to...Child, Father spends most of his time with…Child disparaging Grandparents and has "an attitude." Additionally, …Child feared that if he was forced to go back to Father's house for the summer, he would not be brought back to Pennsylvania.

[C]hild elaborated that Father has told him that Grandparents don't love him and that they are only keeping him for money. Further, …Child mentioned an occasion where Father took him to GameStop where he refused to purchase a video game for…Child, saying[,] "They [Grandparents] get enough money for you." [C]hild also brought up that Father's wife had told him that [E.A.] would shoot him if he returned to Pennsylvania during his visit in the summer of 2019.

On that same day, [this court] found Grandfather in contempt of [c]ourt, and ordered that he immediately transfer custody of…Child to Father as well as comply with other purge conditions as a result of the contempt[.]

This [c]ourt held a hearing on the remaining outstanding petitions on August 13, 2020. Father, Grandfather, and Grandmother testified at the hearing, and the [c]ourt conducted an *in camera* interview of…Child.

[C]hild testified on August 13, 2020 that although he was enjoying his time in Ohio with Father, he desired to continue living in Carbon County with Grandparents. [C]hild expressed that he misses his brother and Grandparents

during periods of separation. He further expressed displeasure with the tension between Grandparents (particularly Grandfather) and Father. [C]hild found Father's comments about his grandparents "not really loving him" or "only using him as a paycheck" to be particularly upsetting.

[C]hild elaborated that even when in Ohio, he is not able to spend much time with Father. He explained that Father is often working and that most of his time this past summer has been spent with his step-brother, [D.] [C]hild expressed that he still does not know how to feel towards his father. The best thing that…Child was able to say about Father is that he is a good cook. In fact, when asked, …Child stated that Father would be in last place on the list of things that he liked about Ohio.

[C]hild stated that he was nervous about what was going to happen (as a result of these proceedings). He elaborated that he was reluctant to go to Ohio that summer because he was afraid that he would not be returned to Carbon County.

In addition to stating his feelings on the custody matter, …Child testified that he enjoys attending school in the Panther Valley School District and has made numerous friends through school. [C]hild performs well in school despite his I.E.P. for a reading comprehension disability.

Grandfather testified about the issues that he has had in communicating with Father. According to Grandfather, Father has blocked his phone number. Additionally, Grandfather testified that he will continue to send…Child to reunification counseling if ordered by the [c]ourt, but that he was under the impression that the counseling had already served its purpose.

Grandfather further raised concerns about forcing…Child to spend more time with Father when he clearly does not wish to do so. Grandfather explained that…Child's half-brother, J.M., and everything that…Child knows are in Carbon County. In addition to J.M., three of the Child's cousins reside at Grandparents' house with…Child.

Grandmother testified that although…Child is not always

- 8 -

available for the scheduled phone calls with Father, and he does not always wish to speak with Father, she continues to encourage him to do so. Additionally, she asserts that neither she, nor anyone in her household, has ever disparaged Father during the scheduled phone calls.

Grandmother admitted that she suffers from diabetes and respiratory problems for which she sometimes uses "a breathing machine." However, Grandmother asserts that she is still able to perform parental duties, such as helping…Child with his school work.

Father testified that despite Grandparents' claims that…Child did not want to visit with Father, …Child calmed down upon leaving Pennsylvania shortly after the July 17, 2020 hearing. Additionally, Father learned during the summer 2020 visit that…Child has pre-diabetes and high cholesterol levels and has since been monitoring…Child's food intake and medication.

Father also testified that he has had difficulty reaching…Child for scheduled phone calls. He stated that he has been referred to as a "sperm donor" by members of Grandparents' household during scheduled calls.

Father further testified that his household does everything together as a family and that if awarded primary custody, he could structure his work schedule to maximize time spent with…Child. In addition to Father's immediate family, Father testified that…Child has extended family in Columbus, Ohio. However, there was no testimony that…Child has met all of the extended family members or established close familial bonds with any of them.

Lastly, Father stated that he intended to enroll…Child in a Catholic school should he gain custody of him during the school year. However, Father did not testify as to the reputation of the schools that he was considering, how those schools would accommodate…Child's I.E.P., or how they compare with the educational program at Panther Valley.

[C]hild's [c]ourt-appointed guardian *ad litem* [("GAL")] argued at the hearing that the custody arrangement should be modified, giving Father primary physical custody. As per

his report, his recommendation is primarily based on the presumption of custody in a child's natural parent. [The GAL] had previously testified that despite his recommendation, he believed that Grandparents loved…Child and that…Child loved Grandparents and his half-brother as if they were his biological family[.] [The GAL] also stressed the importance of stability in…Child's schooling considering his I.E.P., and recommended that the [c]ourt be sure that an appropriate arrangement is made to accommodate…Child in school should custody be transferred to Father[.]

On August 28, 2020, [the court] denied Grandparents' petition to modify custody and for [expedited] hearing concerning [E.A.] This [c]ourt also held Grandfather in contempt of [c]ourt as per the allegations made by Father in his [January 2020 petition for civil contempt and June 2020 emergency petition for special relief]. [The court] ordered additional periods of custody for Father as well as other purge conditions as a result of Grandfather's contempt.

Lastly, on that same date, the [c]ourt denied Father's "Petition to Modify Existing Custody Order," which is the subject of this appeal. [The court] stated in the order that the third-party Grandparents had met their burden of overcoming the presumption that custody should be awarded to a child's natural parent by presenting clear and convincing evidence that it is in…Child's best interest to remain with Grandparents[.]

(Trial Court Opinion, filed October 23, 2020, at 2-18) (internal citations to record and footnotes omitted). On September 25, 2020, Father timely filed a notice of appeal and a contemporaneous concise statement of errors complained of on appeal, pursuant to Pa.R.A.P. 1925(a)(2)(i).

Father raises the following issues for our review:

Whether the trial court abused its discretion by failing to properly apply the presumption of custody in favor of [Father] by failing to consider [Father's] evidence in its

- 10 -

opinion[?]

Whether the trial court erred and abused its discretion by improperly relying on overturned legal doctrine in its analysis[?]

Whether the trial court erred and abused its discretion by misapplying the legal standard used when considering a child's preferences in cases involving a third party[?]

(Father's Brief at 2).

Our standard and scope of review in this case are as follows:

In reviewing a custody order, our scope is of the broadest type and our standard is abuse of discretion. We must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

*C.R.F. v. S.E.F.*, 45 A.3d 441, 443 (Pa.Super. 2012) (internal citation omitted). This Court has consistently held:

[T]he discretion that a trial court employs in custody matters should be accorded the utmost respect, given the special nature of the proceeding and the lasting impact the result will have on the lives of the parties concerned. Indeed, the knowledge gained by a trial court in observing witnesses in a custody proceeding cannot adequately be imparted to an appellate court by a printed record.

*Ketterer v. Seifert*, 902 A.2d 533, 540 (Pa.Super. 2006) (internal citation

omitted). In addition:

> Although we are given a broad power of review, we are constrained by an abuse of discretion standard when evaluating the court's order. An abuse of discretion is not merely an error of judgment, but if the court's judgment is manifestly unreasonable as shown by the evidence of record, discretion is abused. An abuse of discretion is also made out where it appears from a review of the record that there is no evidence to support the court's findings or that there is a capricious disbelief of evidence.

*M.A.T. v. G.S.T.*, 989 A.2d 11, 18-19 (Pa.Super. 2010) (*en banc*) (internal citations omitted).

The paramount concern in any custody case under the Child Custody Act is the best interests of the child. *See* 23 Pa.C.S.A. § 5328 (stating: "In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors…"); 23 Pa.C.S.A. § 5338 (stating: "Upon petition, a court may modify a custody order to serve the best interest of the child"). Section 5328(a) sets forth the best interest factors that the trial court must consider in awarding custody:

**§ 5328. Factors to consider when awarding custody**

**(a) Factors.—**In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:

(1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.

(2) The present and past abuse committed by a party or member of the party's household, whether there is a

- 12 -

continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

(2.1) The information set forth in section 5329.1(a)(1) and (2) (relating to consideration of child abuse and involvement with protective services).

(3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's education, family life and community life.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's maturity and judgment.

(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S. § 5328(a)(1)-(16).

In custody disputes between natural parents and a third party, "there shall be a presumption that custody shall be awarded to the parent. The presumption in favor of the parent may be rebutted by clear and convincing evidence." 23 Pa.C.S. § 5327(b). Accordingly:

> [W]here the custody dispute is between a biological parent and a third party, the burden of proof is not evenly balanced. In such instances, the parents have a *prima facie* right to custody, which will be forfeited only if convincing reasons appear that the child's best interest will be served by an award to the third party. Thus, even before the proceedings start, the evidentiary scale is tipped, and tipped hard, to the biological parents' side.

*V.B. v. J.E.B.*, 55 A.3d 1193, 1199 (Pa.Super. 2012) (quoting *Charles v. Stehlik*, 560 Pa. 334, 340, 744 A.2d 1255, 1258 (2000)).

> What the [trial court] must do, therefore, is first, hear all evidence relevant to the child's best interest, and then, decide whether the evidence on behalf of the third party is weighty enough to bring the scale up to even, and down on the third party's side.
>
> *McDonel v. Sohn*, 762 A.2d 1101, 1107 (Pa.Super. 2000) (quoting *Ellerbe v. Hooks*, 490 Pa. 363, 367-68, 416 A.2d 512, 513-14 (1980)). In [*Ellerbe*,] our Supreme Court noted that "these principles do not preclude an award of custody to the non-parent. Rather they simply instruct the hearing judge that the non-parent bears the burden of

- 14 -

> production and the burden of persuasion and that the non-parent's burden is heavy." Essentially, the Supreme Court determined, "where circumstances do not clearly indicate the appropriateness of awarding custody to a non-parent, we believe the less intrusive and hence the proper course is to award custody to the parent or parents." [**Id.** at 369, 416 A.2d at 514].

**V.B., supra** at 1199.

After a thorough review of the certified record, the parties' briefs, and the relevant law, we conclude that the record supports the trial court's determination. **See C.R.F., supra**. Consequently, we affirm the order denying Father's petition to modify custody for the reasons stated in the trial court's October 23, 2020 opinion.

Specifically, in evaluating the relevant custody factors, the trial court noted that the first factor favored Father, as Grandfather had not permitted contact with Child absent the court's intervention. (**See** Trial Court Opinion at 23-24). The court found that the second factor favored neither party, as there was no current risk of abuse in Grandparents' household and there had been no allegations of abuse in Father's household. (**Id.** at 24). Regarding the third factor, the court indicated that both parties were able to perform parental duties on behalf of Child, but emphasized that Grandparents have been providing for Child's daily needs for over ten years. (**Id.** at 25). The court found that the fourth factor favored Grandparents as they have raised Child with his half-brother since infancy, and Child has attended the same school district his entire life where Child performs exceptionally well academically. (**Id.**) The court found that the fifth factor favored neither party,

as Child has family members in both Carbon County and the Columbus area. (***Id.*** at 26). The court found that the sixth factor favored Grandparents, as Child and his half-brother are very close and have been raised together since infancy. (***Id.***) The court found that the seventh factor favored Grandparents, as Child's preference was to remain with Grandparents in Pennsylvania. (***Id.***)

The court found that the eighth factor favored neither party, as both parties had made disparaging comments about each other to Child. (***Id.***) The court found that the ninth factor and tenth factors favored Grandparents as Child had lived his whole life with them. (***Id.*** at 26-27). The court found that the eleventh factor favored neither party, and noted that the distance between the parties rendered a standard custody schedule unworkable. (***Id.*** at 27). Similarly, the court found that the twelfth factor favored neither party, as both parties could care for Child or make appropriate childcare arrangements. (***Id.***) The court found that the thirteenth factor favored neither party, due to the high level of animosity between both parties. (***Id.*** at 28). The court found that the fourteenth factor was not applicable. (***Id.***) The court noted that with regard to the fifteenth factor, Grandmother has diabetes and respiratory issues. (***Id.***)

Finally, as to the sixteenth factor, the court found that Child's bonds with members of Father's household, Child's physical and mental health, and the GAL's recommendation were additional relevant factors in this case. (***Id.*** at 29). The court noted that Child testified regarding his good relationship with his stepmother and step-brother; that Child was recently diagnosed with

pre-diabetes and that Father carefully monitors Child's diet; that Grandfather did not believe Child would benefit from further therapy, but would comply with court orders directing participation; and that the GAL recommended transferring primary custody to Father. (*Id.* at 29-30).

Further, in applying the law concerning third parties versus natural parents in custody cases, the court acknowledged that Grandparents are not Child's biological grandparents. Nevertheless, the court emphasized that Grandparents have raised Child and his half-brother together for the past ten years, during which they have lived as an intact family unit that has been a stabilizing force for Child after Mother abandoned him. (*Id.* at 30-31). Thus, although the court acknowledged the statutory presumption in favor of Father, it determined that clear and convincing evidence in this case rebutted that presumption and it was in Child's best interests to remain with Grandparents. (*Id.*)

On appeal, Father essentially asks this Court to reweigh the Section 5328(a) factors in his favor. We have carefully reviewed the record in this case, and because the record supports the trial court's reasonable findings and those findings were not the result of an error of law, we accept the trial court's findings and decline to reweigh the evidence.[3] ***See C.R.F., supra***

---

[3] We reject Father's argument presented in his second issue regarding the court's alleged improper reliance on the primary caretaker doctrine in its analysis of the third and fourth custody factors. (***See*** Father's Brief at 18-19). This Court has observed:

- 17 -

(reiterating that where trial court's conclusions are reasonable as shown by record evidence and those conclusions are not result of error of law, appellate court is bound by those conclusions). Accordingly, we affirm based on the reasons stated in the trial court's thorough October 23, 2020 opinion.

Order affirmed.

---

> The "primary caretaker doctrine," as it has come to be known, had its genesis in **Commonwealth ex rel. Jordan v. Jordan**, [448 A.2d 1113 (Pa.Super. 1982)]. In that case, this Court held that in cases involving an award of primary custody "**where two natural parents are both fit**, and the child is of tender years, the trial court must give positive consideration to the parent who has been the primary caretaker." **Id.** at 1115 (emphasis added)[.] … Thus, this doctrine was intended to be an additional consideration that would tip the scales in favor of the primary caretaker in a situation where the trial court deemed both parents to be fit to act as a primary custodian.

**M.J.M. v. M.L.G.**, 63 A.3d 331, 337-39 (Pa.Super. 2013), *appeal denied*, 620 Pa. 710, 68 A.3d 909 (2013). Initially, we note that the primary caretaker doctrine is not directly applicable in this case because Grandparents are not Child's natural parents. In any event, following revisions to the Child Custody Act, "[t]he considerations embraced by the primary caretaker doctrine have been woven into the statutory factors, such that they have become part and parcel of the mandatory inquiry." **Id.** at 339. These factors are: "[t]he parental duties performed by each party on behalf of the child," and "[t]he need for stability and continuity in the child's education, family life and community life." 23 Pa.C.S. § 5328(a)(3), (4). Further, the court did not invoke the primary caretaker doctrine; instead, the court appropriately considered each custody factor. (**See** Trial Court Opinion at 23-31). The fact that Grandparents have been the primary caretakers performing parental duties and providing stability to Child throughout his life is a fact supported by the record and not a misapplication of law. **See C.R.F., supra**.

- 18 -

J-A04021-21

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 2/19/21

IN THE COURT OF COMMON PLEAS OF CARBON COUNTY, PENNSYLVANIA
CIVIL ACTION - LAW

N.M. and
M.M.
  Plaintiffs      :

     v.        :  NO. 14-1196

J.N.M.
  Defendant      :

  and         :

J.W.
  Intervenor      :  533954
               8 36

  and         :

R.M.
  Indispensable Party :

Nicholas J. Masington, III, Esq.   Counsel for Plaintiffs

J.N.M.           Pro Se Defendant

Arley L. Kemmerer, Esquire    Counsel for Intervenor

R.M.            Pro Se Indispensable Party

Adam R. Weaver, Esquire     Guardian Ad Litem for Child
                a minor

<u>MEMORANDUM OPINION</u>

Serfass, J. - October 23, 2020

    Here before the Court is Intervenor J.W. ("Father")'s Appeal of this Court's Order dated August 28, 2020. We file the following Memorandum Opinion pursuant to Pa. R.A.P. 1925(a) and respectfully recommend that our Order of August 28, 2020 be affirmed for the reasons set forth hereinafter.

FS-34-2020

1

## FACTUAL AND PROCEDURAL BACKGROUND

This case dates back to June 20, 2014, when the Plaintiffs, N.M. & M.M. ("Grandparents") who at all relevant times resided in Summit Hill, Carbon County, Pennsylvania, filed a custody complaint requesting that the Court award them sole legal and physical custody of their grandchild J.M. and his half-brother, (hereinafter "the Child")[1]. The Defendant in this case is J.N.M. (hereinafter "Mother"), who is the mother of J.M. and the Child. Though the Plaintiffs (hereinafter collectively referred to as "Grandparents" or "Grandmother" and "Grandfather") have no biological relation to the Child, both children have resided with them for a majority of their lives. The Grandparents further disclosed that the Child's father was not known to them and that he had not been in the Child's life to that point.[2]

After proceedings had begun, but before the Court had issued a final custody order concerning the Child and J.M., J.W. (hereinafter "Father") filed a Petition to Intervene. Father asserted his belief that he was the biological father of the Child and sought primary physical

---

[1] Though the original action in this case concerned both J.M. and the Child, only the Child is the subject of the order from which Intervenor appeals.
[2] The Child was born in 2008, and was five years old at the time of the initial custody action.

custody of the Child through his intervention in this matter. At all times relevant, Father has resided in Columbus, Ohio, with his wife, L.T. and step-child, D.

Father averred through his Petition to Intervene that Mother had concealed herself and the minor child from Father since the Child's birth and that he had been unable to locate Mother or the Child until discovering a docket listing for this case. Father therefore asserted that his petition should be granted so that he could "finally enjoy his right as a parent to have a relationship with his son, and be part of the child's life" (Father's Petition to Intervene, 9/18/14).

In the Grandparents' pre-trial memorandum of September 29, 2014, they argued that they should be awarded primary physical custody of the Child and J.M. because the children had resided with Grandparents since September 2010. Mother resided with Grandparents and the children from September 2010 to September 2013. However, Grandparents asserted that they have been the primary caretakers of the children since September 2010. Grandparents further asserted that if granted primary physical custody of the Child, they would continue to encourage frequent and continuing contact between the Child and his Mother and Father. Additionally, Grandparents believed that several of the

established custody factors were in their favor (Grandparents' Pre-Trial Memorandum, 9/29/14).

On October 2, 2014, Father's Petition to Intervene was granted. Father was confirmed to be the biological father of the Child on December 3, 2014.

Through his pre-trial memorandum, Father argued that Mother had concealed the Child from him until 2014. However, since locating the Child, Father had maintained constant phone contact with him and had one visit with the Child in Ohio. Father argued that the above actions had demonstrated "a strong desire and dedication to be part of his son's life" (Father's Pre-Trial Memorandum, 1/7/15).

A custody hearing was held on March 13, 2015 before this Court. On March 25, 2015, we entered an order awarding joint legal custody of the Child to Grandparents and Father. However, Grandparents were awarded primary physical custody, while Father was awarded partial physical custody. Father's periods of custody were set for the summer recess (commencing one (1) week after the conclusion of the school year and ending two (2) weeks prior to the start of the new school year) and the Christmas holiday in odd numbered years with the precise exchange times to be mutually agreed upon by Grandparents and Father. The Court

further ordered that telephone contact be permitted between the Child and the non-custodial party.

On January 29, 2018, Father filed a petition to modify the custody order of March 25, 2015, in which he again requested that the Court award him primary physical custody of the Child. Through his petition, Father asserted that he is "better-suited at this time to care for the emotional, mental, physical and educational needs of the minor child" (Father's Petition to Modify Existing Custody Order, 1/29/18).

In their pre-trial memorandum relative to Father's petition to modify the custody order, Grandparents argued that primary physical custody of the Child should remain with them, as "a transfer of custody would be particularly inappropriate in light of the fact that, were Father to obtain custody, the same would, necessarily, necessitate a relocation of the minor child from the Commonwealth of Pennsylvania to the State of Ohio thus taking him away not only from the home, extended family, friends, school, community, etc. which he has known for the past ten (10) years but, also, from his sibling of whom the Grandparents continue to maintain primary physical custody" (Grandparents' Pre-Trial Memorandum, 11/16/18).

Father filed a pre-trial memorandum on November 27, 2018, in which he asserted that Grandparents have failed to encourage

frequent and continuing contact between the Child and Father. In support of that position, Father alleged that he was often denied telephone contact with the Child, and that Grandparents have cancelled or failed to appear for reunification therapy sessions (Father and the Child began participating in the sessions after the initial custody order was entered) on several occasions (Father's Pre-Trial Memorandum, 11/27/20).

At the hearing on Father's modification petition, the Child was interviewed in camera. The Child expressed a desire to remain with Grandparents, as he misses his half-brother while he is in Ohio. Grandfather testified that the Child and J.M. "spend almost every waking moment together."

We denied Father's petition to modify the custody order on January 11, 2019. "Based upon their role as primary custodians and caregivers for the last eight and one half (8 ½) years, we find that Grandparents are more likely to attend to the daily physical, emotional, developmental and educational needs of the Child. While we believe that Father is sincere in his desire to be more actively involved in the Child's life, the fact remains that he has not fully exercised the partial physical custody rights vested in him by this Court in our Order of March 25, 2015, spending one (1) month with the Child in Ohio during the summer of 2015 and two (2) months during the summer of 2018

rather than two and a half (2 ½) months each summer and one (1) week between Christmas Eve and New Years Eve in alternating years previously awarded by the Court" (Court's Order of 1/11/19).

On March 6, 2019, Father filed a petition for contempt alleging that Grandparents had failed to produce the Child for reunification therapy sessions as well as scheduled phone calls. Further, Father alleged that Grandparents had failed to allow the Child the privacy to speak openly with Father during therapy and phone calls, and threatened to send the Child to therapy wearing a concealed recording device (Father's Petition for Contempt, 3/6/19).

Pursuant to this Court's order of April 24, 2019, Father's petition for contempt was denied following an evidentiary hearing. However, by agreement of the parties, Father was granted telephone contact with the Child every Monday, Wednesday, and Friday, between 7:00 p.m. and 7:15 p.m.

On July 30, 2019, Father filed a petition for special relief alleging that the Child had confided in him instances of sexual abuse by members of Grandparents' household, one of whom continued to reside at Grandparents' house. The two individuals alleged to have been involved were  ℰ·A.  and a minor child (J.P) who had only resided with Grandparents for two

months, and was not currently residing with Grandparents. Father requested through his petition that he be awarded primary physical custody and that Grandparents' periods of custody be suspended pending the outcome of the investigations (Father's Petition for Special Relief, 7/30/19).

The allegations raised by the Child were investigated by the Carbon County Office of Children and Youth Services and the Lehigh Valley Children's Advocacy Center. The Child's report was validated and the allegations were referred to the Summit Hill Police Department. Additionally, Father's period of physical custody was extended pending the results of the investigation.

On September 9, 2019, Father filed a petition to modify the custody order stating that "Petitioner believes it would be in the child's best interest to grant Petitioner primary physical custody because Petitioner is better-suited to care for the emotional, mental, and physical needs of the child, and can ensure the child's safety within his household" in light of the sexual abuse investigation concerning the Child that was active at the time (Father's Petition to Modify Custody Order, 9/9/19). However, the Child later recanted the allegations on October 9, 2019 (N.T. 2/12/20, p. 58). After an interview of the Child by Emily Greenawald of Carbon County Children and Youth Services,

the Child was deemed safe in Grandparents' home (N.T. 2/12/20 p. 65).

After a hearing on Father's petition for special relief, the Court issued an order on September 13, 2019 allowing Grandparents to resume primary physical custody on September 14, 2019 provided that Grandparents "immediately evict and exclude _C.A._ (one of the perpetrators alleged by the Child) from their residence... Plaintiffs shall ensure that _C.A._ has no contact with _Child_." Other than the aforementioned conditions, the March 25, 2015 order was to remain in effect (Court's Order 9/13/19).

Thereafter, Grandparents filed a petition to modify the custody order on December 18, 2019. Through their petition, they claimed that the Child has recanted his allegations against _C.A._, and that the restrictions concerning _C.A._ should be removed (Grandparents' Petition to Modify Custody Order).

On January 17, 2020, Father filed a petition for contempt alleging that Grandparents had failed to produce the Child for Father's one-week period of custody during the Christmas holiday, as directed by the March 25, 2015 order. Additionally, Father alleged that Grandparents (and the rest of their household) continue to interfere with Father's scheduled

telephone calls with the Child (Father's Petition for Contempt, 1/17/20).

Grandparents explained that they had attempted to comply with the order to produce the Child for the visit with Father over the Christmas holiday. However, the Child refused to go, and had threatened to jump out of the car if Grandparents forced him to go. Therefore, Grandparents made the decision that the Child should not attend the visit with Father (Grandparents Pre-Trial Memorandum, 2/4/20).

On February 5, 2020, Father filed a pre-trial memorandum in support of his petition to modify the custody order. Father alleged that "[i]t would be in the best interest of the child to award primary custody to Father, the child's only natural parent present in his life, with visitations and telephone communication to facilitate ongoing contact with Grandparents and Child's half-brother" (Father's Pre-Trial Memorandum, 2/5/20).

Hearings began on February 12, 2020 relative to the outstanding petitions. Susan Barrandale, who is the reunification counselor for the Child and Father, testified that she became involved in this case on March 24, 2018. The Child had been having difficulty connecting with Father, and Father wanted the Child's next visit to be more comfortable. Ms.

Barrendale testified that one of the issues disclosed to her by the Child is that he "doesn't like places with a lot of people."[3] The Child has also maintained that he misses his brother while he is away, even after he became more comfortable in Father's household.

On June 9, 2020, Grandparents filed a petition to modify custody and for an expedited hearing asking that the Court suspend Father's period of custody during the summer recess until after the completion of the hearing on all outstanding petitions. In support of their position, they alleged that the Child was unwilling to attend the summer 2020 visit with Father, and was threatening to run away or take other extreme measures if forced to attend (Grandparents' Petition for Special Relief, 6/9/20).

Father filed an answer to Grandparents' special relief petition on June 22, 2020. Father asserted that he was opposed to the suspension of his period of custody over the summer, and asked the Court to order that the Child be evaluated by a mental health provider if he was threatening any form of self-harm (Father's Answer, 6/22/20).

---

[3] Father lives in Columbus, Ohio, a city with an estimated total population of 898,553 people compared to an estimated total population of 64,182 in all of Carbon County, Pennsylvania. *QuickFacts: Carbon County, Pennsylvania; Columbus city, Ohio*, U.S. Census Bureau, July 1, 2019, https://www.census.gov/quickfacts/fact/table/carboncountypennsylvania,columbuscityohio /PST045219.

On that same day, Father filed an emergency petition for special relief asking that the Court hold Grandparents in contempt. Father alleged through his petition that Grandparents failed to produce the Child for Father's period of custody beginning on June 12, 2020, that Grandparents continue to interfere with Father's phone contact with the Child, that Grandparents continue to fail to produce the Child for reunification therapy, and that Grandparents disparage Father in the presence of the Child (Father's Petition for Special Relief, 6/22/20).

A hearing was held before this Court on Grandparents' petition to modify custody and for an expediated hearing and Father's emergency petition for special relief on July 17, 2020. The Child was interviewed in camera during the hearing, where he expressed that he had no desire to see Father at all. According to the Child, Father spends most of his time with the Child disparaging Grandparents and has an "attitude." Additionally, the Child feared that if he was forced to go to Father's house for the summer, he would not be brought back to Pennsylvania.

The Child elaborated that Father has told him that Grandparents don't love him and that they are only keeping him for money. Further, the Child mentioned an occasion where Father took him to GameStop where he refused to purchase a video

game for the Child, saying "They [Grandparents] get enough money for you." The Child also brought up that Father's wife had told him that $\mathcal{C}_\cdot \mathcal{A}_\cdot$ would shoot him if he returned to Pennsylvania during his visit in the summer of 2019.

On that same day, we found Grandfather in contempt of Court, and ordered that he immediately transfer custody of the Child to Father as well as comply with other purge conditions as a result of the contempt (Court Order of 7/17/20).

This Court held a hearing on the remaining outstanding petitions on August 13, 2020. Father, Grandfather, and Grandmother testified at the hearing, and the Court conducted an *in-camera* interview of the Child.

The Child testified on August 13, 2020 that although he was enjoying his time in Ohio with Father, he desired to continue living in Carbon County with Grandparents. The Child expressed that he misses his brother and Grandparents during periods of separation. He further expressed displeasure with the tension between Grandparents (particularly Grandfather) and Father. The Child found Father's comments about his grandparents "not really loving him" or "only using him as a paycheck" to be particularly upsetting.

The Child elaborated that even when in Ohio, he is not able to spend much time with Father. He explained that Father is

often working and that most of his time this past summer has been spent with his step-brother, D. The Child expressed that he still does not know how to feel towards his father. The best thing that the Child was able to say about Father is that he is a good cook. In fact, when asked, the Child stated that Father would be in last place on the list of things that he liked about Ohio.

The Child stated that he was nervous about what was going to happen [as a result of these proceedings]. He elaborated that he was reluctant to go to Ohio that summer because he was afraid that he would not be returned to Carbon County.

In addition to stating his feelings on the custody matter, the Child testified that he enjoys attending school in the Panther Valley School District and has made numerous friends through school. The Child performs well in school despite his I.E.P. for a reading comprehension disability.

Grandfather testified about the issues that he has had in communicating with Father. According to Grandfather, Father has blocked his phone number. Additionally, Grandfather testified that he will continue to send the Child to reunification counseling if ordered by the Court, but that he was under the impression that the counseling had already served its purpose.[4]

---

[4] Susan Barradale testified on February 12, 2020 that "I think we have done as much as we can at this point" (N.T. 2/2/20, p. 33).

Grandfather further raised concerns about forcing the Child to spend more time with Father when he clearly does not wish to do so. Grandfather explained that the Child's half-brother, J.M., and everything that the Child knows are in Carbon County. In addition to J.M., three of the Child's cousins reside at Grandparents' house with the Child.

Grandmother testified that although the Child is not always available for the scheduled phone calls with Father, and he does not always wish to speak with Father, she continues to encourage him to do so. Additionally, she asserts that neither she, nor anyone in her household, has ever disparaged Father during the scheduled phone calls.

Grandmother admitted that she suffers from diabetes and respiratory problems for which she sometimes uses "a breathing machine." However, Grandmother asserts that she is still able to perform parental duties, such as helping the Child with his school work.

Father testified that despite Grandparents' claims that the Child did not want to visit with Father, the Child calmed down upon leaving Pennsylvania shortly after the July 17, 2020 hearing. Additionally, Father learned during the summer 2020 visit that the Child has pre-diabetes and high cholesterol

levels and has since been monitoring the Child's food intake and medication.

Father also testified that he has had difficulty reaching the Child for scheduled phone calls. He stated that he has been referred to as a "sperm donor" by members of Grandparents' household during scheduled calls.

Father further testified that his household does everything together as a family and that if awarded primary custody, he could structure his work schedule to maximize time spent with the Child. In addition to Father's immediate family, Father testified that the Child has extended family in Columbus, Ohio. However, there was no testimony that the Child has met all of the extended family members or established close familial bonds with any of them.

Lastly, Father stated that he intended to enroll the Child in a Catholic school should he gain custody of him during the school year. However, Father did not testify as to the reputation of the schools that he was considering, how those schools would accommodate the Child's I.E.P, or how they compare with the educational program at Panther Valley.

The Child's Court-appointed guardian ad litem, Attorney Adam Weaver, argued at the hearing that the custody arrangement should be modified, giving Father primary physical custody. As

per his report, his recommendation is primarily based on the presumption of custody in a child's natural parent. Attorney Weaver had previously testified that despite his recommendation, he believed that Grandparents loved the Child and that the Child loved Grandparents and his half-brother as if they were biological family (N.T. 2/12/20, p. 72-79). Attorney Weaver also stressed the importance of stability in the Child's schooling considering his IEP, and recommended that the Court be sure that an appropriate arrangement is made to accommodate the Child in school should custody be transferred to Father (N.T. 2/12/20, p. 92).

On August 28, 2020, we denied Grandparents' petition to modify custody and for expedited hearing concerning C.A. This Court also held Grandfather in contempt of Court as per the allegations made by Father in his January 17, 2020 "Petition for Civil Contempt for Willful Disobedience of a Custody Order" and his June 22, 2020 "Emergency Petition for Special Relief." We ordered additional periods of custody for Father as well as other purge conditions as a result of Grandfather's contempt.

Lastly, on that same date, the Court denied Father's "Petition to Modify Existing Custody Order," which is the subject of this appeal. We stated in the order that the third-

party Grandparents had met their burden of overcoming the presumption that custody should be awarded to a child's natural parent by presenting clear and convincing evidence that it is in the Child's best interest to remain with Grandparents (Court Order, *Denying Petition to Modify Custody*, 8/28/20).

On September 25, 2020, Father filed an Appeal to the Superior Court of Pennsylvania requesting review and reversal of this Court's August 28, 2020 Order which denied his "Petition to Modify Existing Custody Order."

## ISSUES

In his Concise Statement of Matters Complained of on Appeal, Father raises the following issues:

1. The Trial Court erred by ruling that Plaintiff third-party custodians should retain primary physical custody of the subject minor child where the presumption of custody in favor of Intervenor natural Father was not properly considered and where the record fails to support the Trial Court's determination, upon its analysis of several custody factors as enumerated in Pa. C.S. § 5328, that the Plaintiffs rebutted said presumption by clear and convincing evidence in accordance with 23 Pa. C.S. § 5327(b).

## DISCUSSION

"The paramount concern in child custody cases is the best interests of the child." C.G. v. J.H., 193 A.3d 891, 909 (Pa. 2018). "The best interests standard decided on a case-by-case basis, considers all factors which legitimately have an effect upon the child's physical, intellectual, moral, and spiritual well-being." M.J.N. v. J.K., 169 A.3d 108, 112 (Pa. Super. 2017). Factors to be considered include, but are not limited to, those set forth in 23 Pa. C.S.A. § 5328(a). Id. Moreover, "[i]t is within the purview of the trial court, as the fact finder, to determine which of the factors outlined in 23 Pa. C.S.A. § 5328(a) is the most salient and critical in each custody case." M.J.M. v. M.L.G., 63 A.3d 331, 339 (Pa. Super. 2013).

23 Pa. C.S.A. § 5328(a) provides as follows: "In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:

(1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.

(2) The present and past abuse committed by a party or member of the party's household, whether there is a continued

risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

(3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's education, family life and community life.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's maturity and judgment.

(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational, and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate childcare arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa. C.S.A. § 5328.

In a custody dispute between two (2) biological parents, "the burden of proof is shared equally by the contestants…" Ellerbe v. Hawks, 416 A. 2d 512, 513 (Pa. 1980). However, where- as here- the custody dispute is between a biological parent and a third party, the burden of proof is not evenly balanced. In such instances, "the parents have a 'prima facie right to custody' which will be forfeited only if 'convincing reasons' appear that the child's best interests will be served by an award to the third party." V.B. v. J.E.B., 55 A.3d 1193, 1199 (Pa. Super. 2012). Section 5327 of the Custody Act

pertains to cases "concerning primary physical custody" and provides that "in any action regarding the custody of a child between a parent of the child and a non-parent, there shall be a presumption that custody shall be awarded to the parent. The presumption in favor of the parent may be rebutted by clear and convincing evidence." 23 Pa. C.S.A. § 5327(b). Clear and convincing evidence has been defined by our Superior Court "as presenting evidence that is so clear, direct, weighty, and convincing so as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue." M.J.S. v. B.B., 172 A. 3d 651, 660 (Pa. Super. 2017).

Therefore, "even before the proceedings start, the evidentiary scale is tipped, and tipped hard, to the biological parents' side." V.B., 55 A.3d at 1199. We recognize that the trial court is required to "decide whether the evidence on behalf of the third party is weighty enough to bring the scale up to even and down on the third party's side" prior to awarding primary physical custody to a non-parent. Id. We note, however, that this principle does not preclude the award of custody to a non-parent but simply instructs the trial court that the non-parent bears the burden of production and the burden of persuasion and that the non-parent's burden is heavy. Jones v.

Jones, 8811 A.2d 915, 918 (Pa. Super. 2005). It is well settled that "[w]hile the Commonwealth places great importance on biological ties, it does not do so to the extent that the biological parent's right to custody will trump the best interests of the child. In all custody matters, our primary concern is, and must continue to be, the well-being of the most fragile human participant- that of the minor child." Charles v. Stehlik, 744 A.2d 1255, 1259 (Pa. 2000). "Once it is established that someone who is *in loco parentis*, that person does not need to establish that the biological parent is unfit, but instead must establish by clear and convincing evidence that it is in the best interests of the child to maintain that relationship or be with that person." Jones, 884 A.2d at 917.

In the case at bar, the Court applied the 23 Pa. C.S.A. § 5328 factors as follows:

As to the first factor, Grandparents, particularly Grandfather, have not encouraged frequent and continuing contact between Father and Child. Rather, Grandfather has not permitted such contact absent the Court's intervention. He failed to transport the Child to Ohio for Father's limited custodial periods during the 2019 Christmas holiday and the 2020 summer recess which necessitated the initiation of contempt proceedings

by Father in order to secure his court ordered periods of partial custody with the Child.

As to the second factor, while the Child was in Father's custody during the summer of 2019, he raised allegations of having been sexually abused approximately five to six years ago by     _E.A._     and a minor child, (J.P) both of whom were residing in Grandparents' home at the time. Following an investigation by the Carbon County Office of Children and Youth Services and the Lehigh Valley Children's Advocacy Center, the Child's report was validated and the allegations were referred to the Summit Hill Police Department. The Child later recanted these allegations and no criminal charges were filed. Children and Youth Services determined that there was no safety risk to the Child as E.A. had no unsupervised contact with the Child and the other alleged perpetrator, J.P., had resided at Grandparents' home for a period of only two months approximately five to six years ago. Following a hearing on this matter, the Court issued an order dated September 13, 2019, directing, *inter alia*, that E.A. be evicted and excluded from Grandparents' home and that they ensure that he have no contact with the Child. Accordingly, we find that there is currently no risk of harm to the Child in Grandparents' home. With regard to Father's

household, there are no instances of abuse, past or present, and no risk of harm to the Child.

As to the third factor, while we find that both parties are able to perform parental duties on behalf of the Child and that Father has discharged those duties in a satisfactory manner during the limited period he has exercised physical custody of the Child, we recognize that Grandparents have been providing for the Child's daily needs for over ten (10) years.

As to the fourth factor, the Child and his younger half-brother, J.M., have been raised together by Grandparents since infancy. They have provided the children with a loving and stable home environment. The Child has been enrolled as a student in the Panther Valley School District since kindergarten. About to begin sixth grade at Panther Valley Intermediate School, the Child has performed exceptionally well academically and puts forth a "150% effort" according to his teachers. Other than Father's statement that all schools in Columbus are virtual until October 27, 2020, there was no testimony concerning the Columbus public school system, the school that the Child would attend if enrolled there, the general curriculum, or any specialized educational programs in light of the Child's current I.E.P.

As to the fifth factor, in addition to his half-brother, the Child has three cousins who also live at Grandparents' home in carbon County. The Child's paternal grandparents, aunts, uncles, and cousins all reside in the Columbus area.

As to the sixth factor, although they are not full siblings, the Child considers J.M. to be his brother as the boys were raised together by Grandparents since infancy. As a consequence, the two children are extremely close. The Child is very protective of J.M. and misses him a great deal when they are separated.

As to the seventh factor, the Child's preference is to live primarily with Grandparents in Pennsylvania. We find that his preference to remain in Carbon County is well-reasoned in that his "Gram and Pap," his friends, his brother, his school, and nearly everything he knows is here, providing him with a sense of stability, security, and continuity.

As to the eighth factor, there was testimony indicating that Grandfather has referred to Father as a "sperm donor" in the Child's presence and that Father has repeatedly told the Child that he is "just a paycheck" to Grandparents who do not really love him. The latter comment is particularly upsetting to the Child.

As to the ninth factor, we find that Grandparents continue to be in the best position to provide a loving, stable, consistent, and nurturing relationship with the Child. The Child has been in Grandparents' primary care and has resided with them and his half-brother since he was fifteen months old. He has attended the public schools of the Panther Valley School District since kindergarten, has done well academically and developed friendships with many of his fellow students.

As to the tenth factor, based upon their role as primary custodians and caregivers for the last ten years, we find that grandparents are more likely to attend to the daily physical, emotional, developmental and educational needs of the Child.

As to the eleventh factor, Grandparents reside in Summit Hill, Pennsylvania, and Father resides in Columbus, Ohio. Their homes are approximately six hundred miles apart which equates to a driving distance of approximately eight hours. Therefore, the substantial distance between Grandparents' residence in Pennsylvania and Father's residence in Ohio renders a standard custody schedule unworkable.

As to the twelfth factor, we find that both parties are able to provide child care personally or to make appropriate child care arrangements.

As to the thirteenth factor, there is a great deal of animosity between Father and Grandfather. Father has been described by grandfather, in the course of this case, as being "a sorry piece of crap that doesn't care about his child" and Father describes Grandparents as "bums" and "stupid hillbillies." They do not cooperate, communicate or co-parent effectively. Father believes that Grandparents are intentionally interfering with his ability to parent his son and Grandparents feel unappreciated for raising the Child with no outside assistance. The parties' relationship has rapidly deteriorated as a result of the sexual abuse allegations. As noted by the guardian ad litem, both parties accuse the other of coaching the Child relative to his claims- Grandparents concerning the initial report and Father concerning the recantation of the abuse allegations.

As to the fourteenth factor, there is no history of drug or alcohol abuse in Father's household and there was no testimony concerning any drug or alcohol abuse by any current member of Grandparents' household.

As to the fifteenth factor, Grandmother has diabetes and suffers from respiratory problems for which she sometimes uses a "breathing machine."

As to the sixteenth factor, we find that the bonds formed by the Child with members of Father's household, the Child's physical and mental health, and the recommendation of the Child's guardian ad litem to be relevant factors in this case.

As to the bonds that the Child has formed with members Father's household, the Child testified that he has a good relationship with his stepmother, L.T. and a similar relationship with her son, D. with whom he enjoys spending time and playing video games.

As to the Child's physical health, the Child was recently diagnosed with pre-diabetes type 2 for which he takes prescription medication. According to Father, the Child has high cholesterol levels and he carefully monitors the boy's diet, ensuring that he eats no sugars and only the recommended daily servings of meat and starches.

As to the Child's mental health, Grandfather testified that he does not believe the Child will benefit from further therapy/counseling sessions, but will comply with any order of this Court directing the Child's participation in such sessions.

Lastly, as to the recommendation of the Court-appointed guardian ad litem, Attorney Adam Weaver, according to his written report, pursuant to Pa. R.C.P. 1915.11-2, Attorney Weaver recommends transferring primary physical custody to

FS-34-2020

29

Father. We note that Attorney Weaver's recommendation is based primarily on Father's role as the Child's natural parent.

In applying the law concerning third parties versus natural parents in custody cases, we acknowledge that *Grandparents* are not the Child's biological grandparents. However, they have raised the Child and his half-brother, who is their biological grandson, as siblings. The importance of raising siblings together and maintaining a family unit should not be ignored. See Johns v. Cioci, 865 A.2d 931, 942 (Pa. Super. 2004). "Absent compelling reasons to separate siblings, they should be reared in the same household to permit the 'continuity and stability necessary for a young child's development." L.F.F. v. P.R.F., 828 A.2d 1148, 1152 (Pa. Super. 2003) (absent compelling reasons to the contrary, it is the policy of this Commonwealth to raise siblings together whenever possible); Wiskoski v. Wiskoski, 629 A.2d 996 (Pa. Super. 1993)(policy applies equally to half-siblings); appeal denied, 639 A.2d 33 (Pa. 1994) *emphasis added*.

The Child has established strong emotional bonds with his half-brother and Grandparents who have provided him with care, nurture, affection, and financial support for nearly his entire life. For the past ten years, they have lived as an intact family unit, with Grandparents having assumed sole parenting

responsibility. Since the Child was abandoned by his mother, Grandparents have consistently been a stabilizing force in his life and ensured his well-being without parental assistance. Moreover, we found that uprooting the Child from his home, his school, his support network of family and friends, and separating him from his half-brother, could prove detrimental to his emotional well-being. Accordingly, while we recognize the statutory presumption in favor of the Father, we find that the clear and convincing evidence presented in this case rebuts that presumption and that maintaining the current custody order is in the Child's best interest at this time.

The Court's decision in this case is distinguishable from the decision of the Pennsylvania Superior Court in V.B. v. J.F.B.. The trial court in V.B. found that third-party grandparents should be the primary custodians of the subject children in that case over the biological mother and biological father. V.B., 55 A.3d at 1197. However, the trial court failed to take into account the heightened standard of proof on the third-party grandparents when deciding the case. Id. at 1200. Additionally, the trial court in V.B. took into account various impermissible factors, such as the sexual orientation and lifestyle of the parties, the morality of the biological mother, and a prior custody hearing involving the biological father's

wife as a party. Id. at 1200-1203. In addition to considering impermissible factors, the trial court in V.B. failed to consider factors that are relevant under 23 Pa. C.S.A. § 5328, such as mother's allegations that third-party grandparents' inaction during periods of sexual abuse of her by a paternal uncle. Id. at 1202. Therefore, the Superior Court of Pennsylvania found that the trial court abused its discretion in finding that the third-party grandparents in V.B. had met their burden of presenting clear and convincing evidence to overcome the presumption of custody remaining with a child's natural parents. Id. at 1205.

The Court's decision in the case at bar is based upon our analysis of the factors enumerated in 23 Pa. C.S.A. § 5328. The Court found that the Child's need for stability, his sibling relationships, and his well-reasoned preference to be particularly convincing in awarding primary physical custody to third-party Grandparents in this case. Unlike the court in V.B., the Court did not consider any impermissible factors. Additionally, the Court has taken all allegations of abuse in this case seriously, and has employed the necessary precautions to ensure the safety of the Child, unlike the court in V.B.

In further support of our decision, the Pennsylvania Superior Court in Jones v. Jones found that a third-party, non-

biological parent, who stood in loco parentis for the subject children's entire lives had met the clear and convincing evidence standard to be awarded primary physical custody based on a number of the factors stated in 23 Pa. C.S.A. § 5328. More specifically, the third-party demonstrated that the "children's relationship with *both* parties would be better fostered if custody were awarded to Jones." Jones, 884 A.2d at 918. Additionally, the Superior Court in Jones found that the natural parent's attempts to deprive the third-party of custody of the children had disrupted the children's schooling and overall stability. Id. at 919. The only other factor the court considered in Jones was the third-party's testimony of alcohol abuse and mental instability of the natural parent. However, the trial court did not find the natural parent to be unfit. Id. at 918-919.

Although there is animosity between both parties in this case, the Jones case demonstrates that clear and convincing evidence may be established by only a few custody factors that fall strongly in the third-party's favor. In the case at bar, the Child has been raised by Grandparents for over ten years along with his half-brother, with whom he spends "almost every waking moment." He has never spent more than three (3) months with Father at a time. Though we acknowledge that Father is not

at fault for the circumstances in this case, the standard to be applied is that of the child's best interest. C.G. v. J.H., 193 A.3d 891, 909 (Pa. 2018). The Grandparents in this case have proven by clear and convincing evidence that the Child's best interests would be better served by maintaining stability in the home that he has known for a majority of his life, which is with them and the members of their household in Carbon County.

Further, the Pennsylvania Supreme Court in Charles v. Stehlick upheld the trial court's award of primary physical custody of the subject child to a third-party stepfather over the biological father, where the child considered his stepfather to be a parent. Charles, 744 A.3d at 1258. In making its decision, the trial court considered that the child's school, stepsister, and school friends were all located in the city in which his stepfather lived. Id. at 1257. Additionally, the trial court in Charles considered the child's level of distress in the current custody arrangement. The child's treating therapist testified that the child "felt a strong sense of abandonment whenever he would visit Appellant in New Jersey, and that he worried that he would not be brought back to Pittsburgh." Id. at 1256-1257.

Like the child in Charles, the Child in the instant case has a strong preference to stay in the home in which he was

raised and currently resides, with Grandparents, who he calls "Gram and Pap." This Court considered similar factors to the court in <u>Charles</u> in reaching our decision to uphold primary custody in favor of Grandparents. Additionally, the Child similarly disclosed during his *in-camera* interview that he has had fears of not being able to return to Carbon County while with Father or in anticipation of visiting Father.

Lastly, the Court must consider the preference of the child when deciding any custody case. "A child's preference, though not controlling, is a factor to be considered, so long as it is based on good reasons." <u>Hugo v. Hugo</u>, 430 A.2d 1183, 1186 (Pa. Super. 1981). In <u>E.A.L. v. L.J.W.</u>, the Superior Court of Pennsylvania reversed the trial court's grant of primary custody to the natural mother over a set of grandparents partially based on the trial court not taking the children's preference into consideration. The Pennsylvania Superior Court explained that "[a]s children grow older, more weight must be given to the preference of the child." <u>E.A.L. v. L.J.W.</u>, 662 A.2d 1109, 1118 (Pa. Super. 1995) (citing <u>Grieb v. Driban</u>, 458 A.2d 1006 (1983)). The children in <u>E.A.L.</u> were ages ten (10) and twelve (12). The court ruled that the children's preference to live with their grandparents should have been factored into the decision by the trial court.

In this case, the Child is eleven years old. Throughout the years of proceedings in this matter, he has continuously expressed a clear preference to live with Grandparents. His preference is based upon the close relationship and strong emotional bond that he has formed with Grandparents and his half-brother, J.M. Moreover, as previously mentioned, everything that the Child knows is in Carbon County. Therefore, we found his preference to be well reasoned.

## CONCLUSION

For the foregoing reasons, this Court concludes that an award of joint legal custody and primary physical custody to the Grandparents as outlined in our Order of August 28, 2020 is in the Child's best interest. Therefore, we respectfully recommend that Father's appeal be denied and that our Order of August 28, 2020 be affirmed accordingly.

BY THE COURT:

_____
Steven R. Serfass, J.